SWANSON *v.* STATE.

June 8, 1953

No. 38788 34 Adv. S. 180 65 So. 2d 232

*Robert B. Smith,* Ripley, and *C. H. McCrain,* Houston, for appellant.

*Joe T. Patterson,* Jackson, Assistant Attorney General, for appellee.

LEE, J.

Greenberry Swanson was indicted for the murder of Walter Sprayberry. The jury found him guilty of manslaughter, with a recommendation of mercy, and the presiding judge pronounced a sentence of three years in the penitentiary. From the judgment entered, he appeals.

On December 13, 1951, Swanson and Sprayberry were visiting their friend Lacey Kirkpatrick, in his home near Houlka, Mississippi. Both host and visitors had all passed the meridian of their existence. Late in the afternoon, Kirkpatrick was out of the house for thirty or forty minutes, attending to necessary chores. His guests were drinking that afternoon but they appeared to be friendly and in a good humor. About dark a car blew at the front and Kirkpatrick went to find out the purpose of the caller. After engaging in conversation with that friend for ten or fifteen minutes the car started

up and Kirkpatrick heard a noise like someone bumping on the floor. He went immediately into the house, and Sprayberry, very bloody, was lying near the fireplace, and Swanson was standing in a door which led into another room. At that juncture, according to Kirkpatrick, Swanson pointed to Sprayberry and said, ''Who done that?''

The alarm was spread and neighbors soon began to come in. When Thomas Owen walked up to the scene, Swanson said, ''Hey, Bub, the old man is sorter beat up,'' and asked if Mrs. Sprayberry was coming. He further said that he wanted to shoot Sprayberry but the old man was beaten up and he would let him rest awhile and then finish him up. Levi Hanley, who lived nearby, was of the opinion that Swanson had been drinking. At one time, according to this witness, Swanson, referring to Sprayberry, said, ''There he lays. I will let him rest and then finish him off.'' When Mrs. Sprayberry arrived, she lost control of her emotions and began to scream. According to her testimony, Swanson told her ''to hush that d......... hollering and screaming or he would do her like he did her husband.''

The deputy sheriff, who made the arrest, was of the opinion that Swanson had been drinking. Blood was found on his shoes and cuffs of his trousers. The next morning the sheriff and his deputy made a more careful examination, and, in addition to the blood on the shoes and trousers, they detected gray hairs on the. soles of the shoes. At the hospital, Sprayberry's face and head were badly swollen and bruised, his eyes were completely closed, his jaw was swollen and the contour of his face was barely visible. The doctor was of the opinion that the injuries produced a trauma which resulted in a cerebral concussion, and his subsequent death several days later.

Swanson, testifying for himself, admitted that he and Sprayberry had ''two or three drinks'' while Kirkpatrick was out. His version was that the two were sitting

in the room, talking in a friendly manner, when he heard some kind of rumble, to which he paid no attention. When he looked around, Sprayberry said, "Look out, Green," after which he blacked out and remembered nothing until the next day, when he came to his senses in jail.

Dr. J. H. Hood examined Swanson the next day and found a wound on his lip and cheek and evidence of a hard lick on the left side of the head, sufficient to cause a concussion and loss of memory. This witness also testified that Mrs. Sprayberry told him that she could not believe Swanson committed the act. Ike James, a witness for the defendant, heard part of the same statement by Swanson about which Hanley and Owen testified, but he was uncertain as to whether it was meant for Sprayberry or Chrestman, as Swanson was trying to fight the latter at that time. Kirkpatrick, recalled for further cross-examination, denied that Hanley and Owen were present, and further denied that Swanson made the statement about which they testified.

Albert Chrestman, who lived about a quarter of a mile away and arrived at the scene between six and six-thirty o'clock that evening, had testified on the State's case in chief that Swanson recognized him. In rebuttal, he also testified that when Swanson asked why the witness was present and had received the response, "to take Sprayberry to the hospital," Swanson said: "You ain't going to take him, you G-- d--- s-- of a b-----. I will kill you." Swanson then ran at the witness, and was, in turn, struck by the witness on the cheek with brass knucks, which knocked him to the floor. Hanley also testified that while Sprayberry was being placed in the truck, Swanson took a swing at the witness and that he returned the blow to the mouth and Swanson "went to sleep." Both of these witnesses testified that Swanson knew what he was doing on that occasion.

Appellant contends here that he and the deceased were good friends; the quantity of liquor consumed was in-

sufficient to dethrone his reason to such an extent that he would perpetrate such a crime; there was no motive for it; and that most likely some unknown marauder entered the house, in Kirkpatrick's absence, and committed the cruel and mortal beating.

It can not be postulated that a man never kills his friend. The reports contain many of such cases. In some, human beings have killed those who were near and dear to them. We even have matricides, patricides, uxoricides and fratricides. Besides there is no rule by which to forecast the extent of man's deviltry and cruelty simply from the volume of intoxicating liquors which have been taken into his system. It is common knowledge that liquor affects different persons in different ways. Some become happy. Some go to sleep. Others become mean, overbearing and cruel. The amount of liquor does not necessarily govern. Often times, tolerance is determined by the condition of the system. Holy Writ intones that "strong drink is raging." Proverbs 20:1.

Motive usually arises out of some form of covetousness. It also springs from a spirit of revenge. Sometimes it occurs as a result of indifference to consequences. Proof of the motivating cause for a crime is of great benefit in establishing the guilt of the accused. Sometimes, however, it is impossible to produce proof of the killer's reason for so doing. ██ But nowhere in our jurisprudence is found a basis for the acquittal of a killer merely because the State is unable to point out, by proof, the particular reason which the accused had for the killing of his fellowman.

██ It is a reasonable conclusion that Swanson, under the influence of intoxicating liquor, became angered at Sprayberry and kicked and stamped him unmercifully, to such an extent as subsequently to produce his death. See Section 2224, Code 1942.

Besides, the blood on the shoes and trousers negatived the contention that Swanson himself was knocked into insensibility by some unknown marauder, for, in

that event, it would seem altogether improbable that he would have wandered over to the part of the room where the blood and Sprayberry's battered body were found. Too, the incriminating statements and his pugilistic movements were not only evidence of his existing consciousness but were of substantial probative value in reference to his state of mind, namely, an utter indifference to the consequences of his acts.

Obviously his version, when considered in connection with all of the facts and circumstances, can find no solace from the rule recognized in Weathersby v. State, 165 Miss. 207, 147 So. 481, and the cases which follow that rule.

There was no evidence that a mysterious marauder appeared about the premises and did the damage in so short a period of time. The jury was warranted in treating such possibility as purely fantastic and conjectural.

 Guilt may be proven by circumstantial evidence when it meets the test laid down in Dickins v. State, 208 Miss. 69, 43 So. 2d 366, and the cases there cited. Added to such evidence in this case were the incriminating statements and conduct of Swanson at the scene, the blood on his shoes and trousers and the gray hairs on the soles of his shoes. It seems much more probable that his loss of memory resulted from blows by fists and knucks at the hands of Hanley and Chrestman, rather than from the suggested mysterious marauder.

We find no reversible error in the case; and the judgment of the lower court is, therefore, affirmed.

Affirmed.

*McGehee, C. J.,* and *Kyle, Arrington* and *Ethridge, JJ.,* concur.