618 So.2d 1306 (1993)
David Carrol TYLER
v.
STATE of Mississippi.
No. 90-KA-1130.
Supreme Court of Mississippi.
May 27, 1993.
*1307 A. Randall Harris, Jackson, for appellant.
Michael C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
PITTMAN, Justice, for the Court:
This is an appeal from a murder conviction in the Hinds County Circuit Court wherein the Appellant, David Carrol Tyler, was sentenced to life imprisonment. Tyler does not dispute that he killed the decedent, Robert Singleton, but claims that he was legally insane at the time of the killing. The trial judge found Tyler legally competent to stand trial wherein a jury found Tyler guilty of murder. Tyler's motion for a new trial was denied, and thus he perfected his appeal to this Court. We find Tyler's assignment of error without merit and hereby affirm both his murder conviction and sentence of life imprisonment.

I.
The facts in this case are not in dispute. David Carrol Tyler can be described as a self-proclaimed preacher and somewhat of a wanderer. His travels led him to Jackson, Mississippi in 1988. It was here that he met the victim, Robert Singleton. Since Tyler neither had a place to live nor a job, Singleton provided him with both. Tyler was given a room in Singleton's house as well as a job doing chores at his tire business.
On the night of April 21, 1989, Singleton and Tyler went out for a couple drinks at Rose's Bar, a Jackson nightspot. Sometime that night, the two men got in an argument stemming from the next day's work assignment. Apparently Singleton wanted Tyler to wash cars the next day at the tire business, but Tyler stated that he wanted to sell tires instead. Tyler even claimed that several customers were supposed to drop by the next day to buy tires from him. After consuming a few drinks, the two men headed back to Singleton's house, each retiring to his own room. Barbara Moore, a long-time friend of Singleton's, remembers seeing Tyler outside the club at around 3:00 a.m., and that he had been drinking.
After lying in bed a few minutes, Tyler reached under his mattress where he kept a pistol which Singleton had given him, and walked to Singleton's room. Finding Singleton *1308 asleep in his bed, Tyler put the loaded .38 pistol near the temple of Singleton's head and pulled the trigger at pointblank range. Tyler then shot Singleton again on the other side of his head. The autopsy revealed the presence of two bullets still in or around the cranial vault, which was determined to be the cause of Singleton's death.
Around 6:30 a.m. on April 22, 1989, Barbara Spann, a friend of the deceased Singleton, was awakened by her cousin with whom she lived and told that Tyler was outside waiting for her. Spann went outside where she saw Tyler behind the wheel of Singleton's beige Cadillac. She thought that was odd because Singleton never allowed anyone to drive his car. Tyler apparently told Spann that Singleton had sent him (Tyler) to pick her (Spann) up and to buy her whatever she wanted. When Spann asked where Singleton was, Tyler told her that he was at home asleep. Spann returned to the house and got dressed. After she joined Tyler in the car, they stopped by a convenience store where Tyler purchased two beers, two Champales, and some cigarettes. Tyler then drove to Singleton's house, where he dropped a bottle of Champale on the porch while trying to unlock the door.
After Tyler and Spann were inside, Spann again asked Tyler where Singleton was. This time, he told her that Singleton was in his room sleeping. Seeing Singleton's door closed, she decided to open the door slightly to see if Singleton was awake. Noticing that Singleton was still in his bed, Spann tried to wake him up. Upon realizing that Singleton had been shot in the head, Spann began screaming. After a few moments, Spann turned around to see Tyler pointing a gun at her and claims that Tyler told her "I'm going to shoot you the same way I shot  killed Robert." Spann also claims that Tyler ordered her to go in the back room and to take her clothes off, telling her that he had always had a thing for her. She put her jacket on the bed and was allowed to go to the rest room, but only with the door open. In an attempt to stall Tyler, Spann asked for a beer and the two sat on the couch and talked.
Apparently, Tyler stated that he killed Singleton because "he wanted to die" and that after each shot, Singleton said "thank you, David." Tyler then unloaded the gun and stated that "he wanted the rock" (crack cocaine) and proceeded to go to the car and returned with a water bottle full of change. After counting out $20 in change, Tyler apparently changed his mind and wanted powdered cocaine. Spann told him that she knew where he could get some, so they got in Singleton's car and went to Spann's aunt's house on Ginger Street. Tyler placed the pistol between his legs while driving the car. When they arrived at the house on Ginger Street, Tyler remained in the car while Spann went inside the house, locked the door, and called the police. Two patrol cars responded to the scene, finding Spann in a hysterical state. Not knowing why Spann had not come out of the house, Tyler drove off.
When the police arrived at the house, Spann got in the police car and told them everything that had happened that morning. While en route to Singleton's house, the police spotted Tyler driving Singleton's car, pulled him over and arrested him. Upon arriving at Singleton's house, the police discovered the door locked, and asked Tyler for his key. Tyler, then in the back of the police car, voluntarily handed the officers the key to the house. Once inside, the police found Singleton's body in his bedroom, and promptly secured the crime scene. The officers also found two spent hulls from a pistol as well as Spann's jacket on the bed where she claimed to have left it.
Following an unsuccessful search for the murder weapon, the officers returned to the police car in which the hand cuffed Tyler had been placed in the back seat. When one of the officers mumbled something about not finding the gun, Tyler stated, "I'll tell you where the pistol is," and proceeded to tell them that it was under the seat of the police car. Apparently when Tyler was arrested, he had placed the gun in the small of his back so that the police were not able to find it in their brief pat-down. Besides finding the .38 caliber *1309 pistol, a small smoking pipe was found under the seat. The pistol held three live rounds left when it was found.
Following the discovery of the gun, Tyler was transported to the police station and booked. Tyler was processed at the police station by James Smith, who was working in the booking and receiving department of the Jackson Detention Center. Smith remembers that Tyler was "a little bit off" and acted like he had been drinking. Smith heard Tyler mumble "I'm not going to let anyone run over me." Thirty-three dollars in change was found in Tyler's pockets upon his arrest. After being processed at the jail, Tyler was re-Mirandized and questioned. Tyler voluntarily signed a waiver of rights document at that time. When questioned about the mornings' events, Tyler recounted them much the same as Spann had, except that he denied holding a gun on her. Tyler also admitted killing Singleton, but could not give a reason why he had done so. Throughout the questioning, the officers noted that Tyler had no problem communicating with them.
While in custody, Tyler was screened by Dr. Charleton Stanley, a Jackson psychologist, and his partner, Dr. Donald Guild, a psychiatrist who also possesses a law degree. Both were of the opinion that Tyler suffered from paranoid schizophrenia and delusional beliefs. Although the screening was brief, both felt Tyler was legally insane and needed further evaluation by the doctors at Whitfield. Tyler was transported to the Mississippi State Mental Hospital in Whitfield and evaluated for eight weeks. Following this extensive evaluation, a team of two psychologists and two psychiatrists met to discuss Tyler's diagnosis. The final diagnosis found that Tyler suffered from symptoms of a personality disorder. However, all four doctors were not in total agreement on the diagnosis because two doctors were concerned about Tyler's religious obsession. When it was time to form an opinion as to Tyler's ability to distinguish right from wrong, i.e. whether Tyler was capable of knowing right from wrong at the time the act was committed, those same two doctors chose not to render an opinion. The two doctors who did form an opinion as to Tyler's legal capacity believed that Tyler knew right from wrong at the time of the murder. Tyler proceeded to trial, where a jury found him guilty of murder and the judge sentenced him to life imprisonment. Feeling aggrieved, Tyler appeals his conviction on the following ground:

THE JURY'S VERDICT OF MURDER WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE

II.
Mississippi still applies the M'Naghten test for the determination of insanity. Roundtree v. State, 568 So.2d 1173, 1181 (Miss. 1990); Davis v. State, 551 So.2d 165, 173 (Miss. 1989). Simply stated, "the test for insanity is whether the defendant was unable to distinguish right from wrong at the time the act was committed." Roundtree, 568 So.2d at 1181; White v. State, 542 So.2d 250 (Miss. 1989). The determination as to a defendant's sanity is within the province of the jury, which may accept or reject expert and lay testimony. Roundtree, 568 So.2d at 1181; Yarbrough v. State, 528 So.2d 1130, 1130 (Miss. 1988); Gill v. State, 488 So.2d 801, 802 (Miss. 1986). The jury's determination will remain undisturbed unless this Court is convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. May v. State, 460 So.2d 778, 781 (Miss. 1984); Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983).

Medical evidence
The main thrust of Tyler's argument centers around the differing medical diagnoses and the final determination of his legal competency. In the alternative, Tyler argues that since there was no evidence of a deliberate or premeditated design present in the killing of Robert Singleton, his conviction of murder cannot stand. Specifically, Tyler claims that the jury disregarded conflicting medical testimony as to both his diagnosis and determination of legal competency when the jury found him legally sane to stand trial. In support of *1310 this contention, Tyler relies on the initial diagnosis of Dr. Charleton Stanley, a psychologist, and Dr. Donald Guild, a psychiatrist, who screened Tyler six months after his arrest, while he was housed at the Hinds County Detention Center. After talking with Tyler for a period of about twenty minutes, Dr. Stanley concluded that Tyler was suffering from paranoid schizophrenia and delusional belief. Dr. Stanley defined paranoid schizophrenia as hearing voices others cannot hear and seeing people others cannot see. Tyler complains of hearing voices and claims that God speaks to him through his shaving mirror.
According to Dr. Stanley, Tyler also suffers from delusional belief, which is the belief in impossible things. Dr. Stanley classified Tyler's dialect as circumstantial, which is characterized by lengthy, disorganized speech. Dr. Stanley testified that he did not believe Tyler was malingering, because mentally ill people are usually defensive and will not open up about voices or visions. Finally, Tyler told Dr. Stanley that he felt controlled, and that voices told him to shoot Singleton. When asked his opinion as to Tyler's mental condition at the time of the murder, Dr. Stanley did not think that Tyler was unable to tell right from wrong, but he felt controlled by outside forces. Otherwise stated, Dr. Stanley felt that Tyler knew right from wrong at the time of the murder, but was influenced by outside forces that prevented him from resisting the impulse to kill.
Dr. Guild, who also screened Tyler at the Hinds County Detention Center, concurred in Dr. Stanley's diagnosis of paranoid schizophrenia and delusional belief. It was also Dr. Guild's opinion that Tyler did not know right from wrong at the time of the killing. Dr. Guild noted that Tyler did not make sense at the evaluation and was not even sure whether Tyler knew the purpose of the screening. Dr. Guild based his opinion on Tyler's belief that he was some sort of "messenger from God." Tyler seemed to be coherent in some areas, but when the subject of the murder came up he just didn't make sense. Dr. Guild, like Dr. Stanley, agreed that a person can suffer from paranoid schizophrenia and still know right from wrong. Dr. Guild did state, however, that the doctors at Whitfield were in a better position to evaluate Tyler than he was, because of his brief visit with him.
After being transferred to Whitfield, Tyler was evaluated by four doctors, namely Dr. Helen Robertson, a clinical psychologist, Dr. Reb McMichael, a psychiatrist, Dr. Lancaster, a neurologist, and Dr. Undesser, a psychiatrist. At the conclusion of Tyler's eight week evaluation period, the four doctors met at what is called a "staffing," which is a formal presentation of the patient, his history, any test or lab results, as well as nurses' notes, which are all considered in the determination of both a final diagnosis and an opinion as to the patient's legal sanity at the time of the act. Tyler's final diagnosis was that he was suffering from a personality disorder, with borderline narcissistic features. When asked to determine whether Tyler was legally sane, i.e., whether he knew right from wrong at the time of the killing, only Dr. Robertson and Dr. McMichael formed the opinion that Tyler was legally sane at the time of the murder. Neither Dr. Lancaster nor Dr. Undesser chose to form an opinion as to Tyler's legal competency.
Tyler's evaluation at Whitfield consisted of twenty-four hour observation for a period of eight weeks. Out of the four doctors who participated in the final diagnosis, Dr. Robertson had the most exposure to Tyler, having seen him on ten or twelve occasions. Robertson administered two personality tests, namely the Minnesota Multiphasic Personality Inventory (MMPI) and the Millan Clinical Multiaxial Inventory (MCMI), which indicated no signs of psychosis. Although Dr. Robertson did not diagnose Tyler as psychotic, she did classify him as suffering from a personality disorder. Dr. Robertson testified at trial that even if her diagnosis of Tyler was incorrect, she still believed that Tyler knew right from wrong at the time of the killing. This opinion was based on several factors. First, Tyler had described the victim, Robert Singleton, as a dope dealer, and since Tyler lived in the same house as Singleton, Tyler felt that he was going to get caught in the same sin in *1311 which Singleton participated. Apparently Tyler felt that Singleton was pressuring him to take up his lifestyle. Tyler also stated that he and Singleton were out together the night before drinking whiskey and smoking cocaine, things he felt were wrong to do. On one occasion, Tyler told Dr. Robertson of the work-related fight which he and Singleton had the night before Singleton was killed. This fight might explain both the shooting as well as Tyler's statement of "I'm tired of people running over me" to the booking agent at the police station. Dr. Robertson pointed to Tyler's act of hiding the pistol under the seat of the police car as a sane, evasive act which shows that Tyler knew what he had done was wrong. In Tyler's initial interview at Whitfield, he stated that he didn't blame God, Satan, alcohol or cocaine for his actions, but that he blamed only himself. Another red flag was that Tyler seemed very interested in the results of the psychological tests which he had been given as well as Dr. Robertson's interpretations of the tests. Finally, when Tyler was admitted to Whitfield for observation, he was administered mild anti-psychotic medication for a short period. Dr. Robertson detected little, if any, change in behavior thereby leading her to doubt the severity of Tyler's mental illness.
Another doctor, Dr. Reb McMichael, agreed with Dr. Robertson's diagnosis of borderline personality disorder and that Tyler was legally sane at the time of the murder. Specifically, he believed that Tyler knew and appreciated the nature of his actions, and most importantly, knew that killing Robert Singleton was wrong. Although Dr. McMichael had not observed Tyler prior to the "final staffing," he based his opinion on reports and notes made by staff members, test results, and finally, the face to face interview with Tyler which he conducted at the staffing.
Dr. McMichael specifically based his opinion on several factors. The first of these was Tyler's statement to officers at the police station in which he confessed to the murder. This occurred only hours after the shooting, and the police were in a very good position to attest to Tyler's mental state. The officers testified that Tyler was able to effectively communicate with them during his hour and a half questioning at the police station. Next, there were Tyler's statements to Barbara Spann the morning of the murder as well as the statements made at the screening evaluation and "final staffing." Dr. McMichael's diagnosis found that Tyler exhibited traits of borderline personality disorder, which can be evidenced by instability in one's mental process, some occasional psychotic symptoms, intense feelings, and frequent anger. Dr. McMichael stated that Tyler's mood problems could be the result of a 1973 gunshot wound to his head, which may have affected his brain organically. He noted that the presence of a personality disorder would not per se preclude a person from knowing right from wrong, nor would impulsive behavior have a direct correlation in distinguishing right from wrong.
Although neither Dr. Lancaster nor Dr. Undesser testified at trial, both expressed reservations about the final diagnosis and opinion as to Tyler's legal competency at the "final staffing." What troubled them most was Tyler's obsession with religion and his mood problems. Like Dr. McMichael, Dr. Undesser's opinion was based solely on the "final staffing." However, Dr. Lancaster was able to observe Tyler on a few occasions prior to his final evaluation. Because of their reservations, neither Dr. Lancaster nor Dr. Undesser participated in the determination of Tyler's legal competency to commit the criminal act.
Tyler claims that the doctors should have considered his alleged past treatment at the University of Southern California Hospital during the 1960's, where he was diagnosed as being psychotic and exhibiting suicidal tendencies. Tyler told Dr. Stanley and Dr. Guild at the initial screening of one attempted suicide in which he drank Purex. However, Tyler's assertions of prior mental illness and suicide attempt could not be verified because all of University of Southern California Hospital's records have been destroyed.

*1312 Other evidence

There are strong indications which reveal that Tyler was sane and knew right from wrong at the time of the killing. First is the confession made to Barbara Spann hours after the murder occurred. Tyler deceived Spann in order to get her into the car, telling her that Singleton, allegedly at home, had sent him to pick her up. Then at Singleton's house, he tried to hide the fact that Singleton was dead by saying that he was in his room asleep. These deceptive acts reveal Tyler's state of mind, in that he knew he would have to deceive Spann in order to get her to accompany him. This shows Tyler knew right from wrong shortly after the murder. Next, there is Tyler's act of hiding the murder weapon under the seat of the police car. Only someone with a guilty mind and who knew what he had done was wrong would do such an act.
Tyler's confession to officers at the police station was done voluntarily, following Tyler's signing a Waiver of Rights document. An employee who "processed" Tyler upon his arrival at the police station, testified that Tyler was a "little off," and that this might be alcohol induced. The officers who arrested Tyler and later interviewed him at the police station where he confessed to the murder testified that they had no problem communicating with Tyler in all their dealings with him. Tyler's statement, "I'm tired of getting walked on," made to the booking officer is consistent with Tyler and Singleton's argument the previous night concerning the next day's work. There was testimony that alcohol might have contributed to the crime. Tyler was seen having a few drinks until the wee hours of the morning prior to the murder. Tyler stated that he had smoked some cocaine and had a few drinks that night. Spann testified that Tyler purchased two Champales and two beers after he picked her up. The booking agent at the police station detected the odor of alcohol on Tyler when he was processed. Thus, it raises the question of whether voluntary intoxication and/or drug use, and not insanity, was the contributing factor to Singletary's murder.
Besides arguing conflicting medical evidence, Tyler argues that there was no credible testimony evidencing a deliberate or premeditated design to kill the victim to support the conviction of murder. He specifically claims that other than his signed confession, there is no physical evidence supporting premeditation. Tyler argues that an absence of motive negates any premeditation. He basically states that this was an impulsive act, not some pre-planned event.
Tyler, however, told Dr. Stanley that Singleton was not a "Godly man" and felt Singleton was controlling him. Tyler described Singleton as a drug dealer, and Dr. Guild noted that Tyler might have been under the influence of alcohol or drugs at the time of the murder.
In Graham v. State, 582 So.2d 1014 (Miss. 1991), this Court addressed what constitutes premeditation:
Although our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before pulling the trigger.
582 So.2d at 1018 (quoting Blanks v. State, 542 So.2d 222, 226-27 (Miss. 1989). Despite Tyler's argument, proof of motive is not essential to a conviction for a felonious homicide. Roberts v. State, 458 So.2d 719, 722 (Miss. 1984); Barnett v. State, 232 Miss. 208, 98 So.2d 656 (1957); Swanson v. State, 218 Miss. 103, 65 So.2d 232 (1953).
In the present case, the jury was instructed that if "the defendant, David Carrol Tyler acted wilfully, unlawfully, and feloniously, without authority of law, and not in necessary self-defense, with deliberate design to effect the death of Robert Lee Singleton ...," and if Tyler knew right from wrong at the time of the act, then he should be found guilty of murder. After considering all the evidence, the jury found that Tyler's actions were, in fact, deliberate in nature, thereby meeting all of the elements of murder. This Court will not disturb a jury's finding absent an "unconscionable injustice," and we find that the jury's verdict was in accordance with the evidence *1313 presented at trial and should not be disturbed.
The facts of the present case are strikingly similar to those in Lias v. State, 362 So.2d 198 (Miss. 1978), wherein this Court upheld the murder conviction of Frankie Lee Lias, a self proclaimed "Black Moses." In Lias, defense experts testified that Lias suffered from paranoid schizophrenia and delusions of speaking to God. The State did not present any expert medical testimony other than a doctor stating that Lias seemed "solemn and remorseful" in jail a few days following his arrest. Family members and friends of Lias's testified that he appeared normal and coherent around the time of the murder. In upholding Lias's conviction, this Court stated:
While admitting the closeness of the factual determination, we also acknowledge that such determination is the purpose for which juries exist. We are unwilling on an appeal to overturn a jury determination unless such determination is unsupported by the facts.
Id. at 201.
Although there is conflicting medical testimony as to Tyler's diagnosis and legal capacity to commit the criminal act, the jury weighed this evidence in arriving at their verdict. Both medical and lay testimony was presented to support the conclusion that Tyler was legally sane at the time of Singleton's murder. Tyler's subsequent evasive acts of hiding the gun in the police car and statements to police further strengthen the basis for the jury's verdict. In conclusion, we must reiterate that mental illness, in and of itself, does not constitute legal insanity. Therefore, we affirm the lower court's murder conviction and sentence of Tyler to life imprisonment.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THIS SENTENCE SHALL RUN CONSECUTIVELY TO ANY OTHER SENTENCES IMPOSED UPON THIS APPELLANT BY ANY COURT.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.