# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-01140-SCT

*TERELLE ANTERION JOHNSON a/k/a*
*TERELLE JOHNSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/22/2024 |
| TRIAL JUDGE: | HON. STEPHEN B. SIMPSON |
| TRIAL COURT ATTORNEYS: | JOEL SMITH |
| | BILLY EDWARD STAGE |
| | WILLIAM CROSBY PARKER |
| | MATTHEW DRAKE BURRELL |
| | JIM L. DAVIS, III |
| COURT FROM WHICH APPEALED: | STONE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/23/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Terrelle Johnson, who suffers from serious mental illness, killed and decapitated his mother.  The initial discovery of this crime was the result of a warrantless search of the home in which Johnson lived with his mother.  After a trial for first-degree murder, during which the insanity defense was presented to the jury, the jury found Johnson guilty of first-degree murder.  Johnson appeals, raising several issues primarily connected to the warrantless search

and his sanity. Because the trial court did not commit reversible error, this Court affirms his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.    In 2018, Johnson lived with his mother, Sherry Johnson, in her home in Stone County, Mississippi. On June 6, 2018, Sherry's family members began to worry about her because no one had heard from her in a few days. Sherry's brother, Derrick Johnson, whose house was approximately four hundred feet from Sherry's house, went to her house to check on her. Johnson told Derrick that Sherry had gone on vacation. Derrick did not believe him because he opined that Sherry would never go on vacation without informing anyone, so he asked to check the house. Johnson refused to allow Derrick into the house, so the family called the authorities. On the same day, members of the Stone County Sheriff's Department arrived at Sherry's house to perform a welfare check as a result of the many phone calls they had received from her family members.

¶3.    When officers, including Captain Boggs[1] and Deputy Sharpe, arrived, Johnson was acting normally. Captain Boggs informed Johnson that he wanted to "holler" at the door for Sherry, and Johnson responded that he wanted a search warrant for that because he did not want anyone messing with his "stations." Captain Boggs informed Johnson that he did not need a search warrant; he just needed to check whether Sherry was inside so that the family would stop calling them, and Deputy Sharpe informed Johnson that the family had called approximately twenty times. Captain Boggs asked that Johnson let him and Deputy Sharpe

---

[1]By the time evidentiary hearings and trial occurred, Captain Boggs had died.

2

inside, and Johnson responded, "alright." Johnson led them inside the house, and Captain Boggs went to open the door to Sherry's bedroom, but it was locked. Johnson explained that he had that door locked because his "station" was playing in there, and that no one was inside the room. When, seconds later, Captain Boggs asked Johnson if he had a key to the room, he said no because Sherry had locked the door and had left, and everything was safe in there.

¶4. Captain Boggs and Deputy Sharpe then looked around the house and the back yard in search of Sherry. While Deputy Sharpe continued to search the back yard, Captain Boggs went inside and opened the locked door to Sherry's bedroom. While Deputy Sharpe was still searching the back yard, Captain Boggs, having opened the locked door to Sherry's bedroom, returned outside and told Deputy Sharpe that he believed that Johnson had stabbed Sherry. When Captain Boggs informed him of this, Deputy Sharpe was using his flashlight to look around the back yard, still engaged in the observation of the back yard. At that point, the officers found Sherry's decapitated body near some trees within an area of the back yard that they had not yet searched, approximately six feet inside of the privacy fence. Again, the area where Sherry was found was in a portion of the back yard that had not yet been searched by Deputy Sharpe, whose search of the back yard was ongoing. Sherry's head was eventually located several feet outside the privacy fence.

¶5. The scene was then preserved, a search warrant was obtained, and the scene was processed by the Stone County Sheriff's Department and the Mississippi Bureau of Investigation (MBI). Sherry's bedroom contained large amounts of blood, including blood

splatters in multiple places. It also contained two knives that had apparently been used to stab Sherry.

¶6. Johnson was arrested, after which he twice confessed to killing Sherry. Major Schonewitz with the Sheriff's Department interviewed him after Johnson waived his *Miranda*[2] rights. During this recorded interview, Johnson confessed to killing Sherry. Further, Johnson's phone calls while he was an inmate in the Stone County Jail were recorded. Johnson made a phone call to his father in which he confessed to killing Sherry.

¶7. Johnson was indicted for murder on January 15, 2019. Johnson was subsequently ordered to submit to a mental evaluation, and on November 12, 2019, the court found Johnson incompetent to stand trial and ordered that he be confined to Whitfield to be treated and potentially rehabilitated. In 2024, after rehabilitation in Whitfield, the trial court found Johnson competent to stand trial.

¶8. Before trial, Johnson moved to suppress the evidence discovered through the warrantless search of the house. The trial court denied that motion.

¶9. At trial, the State introduced evidence of the scene at the house, evidence connecting the blood and DNA from the bedroom to Sherry and Johnson, evidence regarding the knives used to stab Sherry, and evidence regarding the autopsy, which included details regarding the extensive injuries to Sherry, as well as her cause of death. The forensic pathologist opined that the cause of Sherry's death was multiple blunt- and sharp-force injuries, and that he could not exclude strangulation as a cause of death. The recordings and transcripts of

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

Johnson's confessions to Major Schonewitz and his father were also admitted into evidence. Ample evidence was introduced that Johnson and Sherry had been fighting over credit cards and money, and that Johnson falsely believed that Sherry was stealing money and cards from him.

¶10.   The State also introduced Deputy Sharpe's body-camera video.  It was initially admitted into evidence without objection.[3]  The end of the video depicted Johnson being arrested and the family getting very upset with Johnson.  At that point in the video, the defense objected that the end of the video with the family acting upset was not relevant and was prejudicial to Johnson.  The trial court responded, "this is a DVD that was produced in evidence, offered to you and produced to you in discovery, correct?"  Defense counsel answered in the affirmative, and the trial court confirmed that when it was offered into evidence shortly before, defense counsel had no objection.  Defense counsel responded, "I didn't think they were going to go into the family thing.  They indicated to me that they were going to cut the beginning and end off.  I thought – cut the end off, they were cutting the family."  The trial court overruled the objection.

¶11.   After the State rested, Johnson put forth expert testimony regarding his insanity in support of his insanity defense.  His expert, Dr. Brodie, testified that Johnson's IQ was very low.  She discussed the numerous times that Johnson was admitted to the VA Hospital, both voluntarily and involuntarily, and that the VA had diagnosed him with a delusional disorder.  She noted that he was also likely schizophrenic and had been diagnosed with a cannabis use

---

[3]The trial court specifically asked defense counsel if he had any objection, and defense counsel replied, "None."

5

disorder. During one of his VA stays, Johnson had expressed belief that his mother had been killed and replaced by a twin sister, despite his mother stating that she did not have a twin sister. She noted that Johnson was found incompetent to stand trial, rehabilitated at the state hospital, and put on psychiatric medication. When Dr. Brodie met with Johnson, he repeated the claim that his mother was replaced by his aunt.

¶12. With regard to Johnson killing Sherry, Dr. Brodie testified that she believed "his paranoia was so high that he believed that he was justified in what he did." Johnson also told her that he decapitated his mother "so that she couldn't reconnect and come back to life." She further testified that she did not believe he had the mental capacity at the time to appreciate his acts and distinguish between right and wrong. On cross-examination, Dr. Brodie admitted that she was uncertain whether Johnson was straightforward with her. She also stated that Johnson knew he was killing a human being; he just thought he was killing his aunt instead of his mother.

¶13. The State offered a rebuttal witness, Dr. Gugliano, regarding Johnson's sanity. Dr. Gugliano agreed that Johnson was suffering from a mental disease or defect at the time of the killing. She opined that Johnson was indeed schizophrenic and experiencing symptoms of psychosis at the time of the crime. She noted that many of his VA admissions included issues from cannabis use. She also reviewed in detail his many actions and statements close in time to the crime, and she further noted that, at that time, he said that he knew Sherry was dead and that he had killed her. Dr. Gugliano, relying on Johnson's documented behavior and confessions and statements near the time of the crime, opined that Johnson knew that his

6

actions were wrong at the time of the killing. On cross-examination, she admitted that some evidence and indications existed that Johnson did not appreciate the nature and wrongfulness of his actions, but she opined that it was not uncommon to have both evidence indicating insanity and evidence indicating sanity.

¶14. When it was time to submit jury instructions to the trial court, Johnson submitted several instructions that included second-degree murder and manslaughter, including heat-of-passion manslaughter. The trial court refused all of those instructions because the lesser-offense instructions were included, stating, "this is no manslaughter."

¶15. During closing arguments, defense counsel began giving the history of the *M'Naghten*[4] insanity defense. After discussing Joseph M'Naghten's history, he stated, "But [the *M'Naghten* insanity defense] has a beginning before then. A long, long time ago. Y'all know this story. They had a man on a cross[.]" The state objected, and the trial court sustained the objection and instructed defense counsel to "[s]tick to the evidence and the testimony[.]"

¶16. The jury found Johnson guilty of first-degree murder. The trial court sentenced him to life in custody.

¶17. In his motion for new trial or judgment notwithstanding the verdict, Johnson made several arguments, including that the verdict was against the weight of the evidence and that the trial court erred by 1) refusing the second-degree-murder and manslaughter jury instructions; 2) failing to suppress the fruits of the search of Johnson's home; 3) admitting

---

[4]*See M'Naghten's Case* (1843) 8 Eng. Rep. 718, 10 Clark & F. 200.

the end of Deputy Sharpe's body-camera video; and 4) limiting counsel's closing argument. In support of his argument that limiting closing argument was error, defense counsel maintained that the content he was prevented from stating to the jury constituted the following statement: "Then said Jesus, 'Father, forgive them for they **know not what they do**.' And they parted his raiment and cast lots." The trial court denied the motion.

¶18. Johnson appeals and argues 1) the trial court erred by denying Johnson's lesser-included-offense instructions; 2) the trial court erred by denying Johnson's motion to suppress the evidence found as a result of the warrantless search of Johnson's home; 3) the trial court erred by admitting the end of Deputy Sharpe's body-camera video; 4) the trial court erred by limiting defense counsel's closing statement; and 5) the verdict is against the overwhelming weight of the evidence.

## ANALYSIS

*1. Lesser-Included-Offense Jury Instructions*

¶19. This Court reviews the grant or denial of a lesser-included-offense instruction de novo. *Anderson v. State*, 361 So. 3d 609, 614 (Miss. 2023) (quoting *Gilmore v. State*, 119 So. 3d 278, 286 (Miss. 2013)). A defendant is entitled to a jury instruction that presents his theory of the case, but the court may refuse instructions that, among other things, are without evidentiary foundation. *Id.* (quoting *Gilmore*, 119 So. 3d at 286). "The refusal of a lesser-included-offense instruction is proper if, when taking all evidence in the light most favorable to the accused, and considering all reasonable favorable inferences in favor of the accused,

8

the jury could not have convicted" on the lesser-included offense. *Id.* (citing *Hester v. State*, 602 So. 2d 869, 873 (Miss. 1992)).

¶20. First-degree murder requires deliberate design to effect the victim's death. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2020). Deliberate design may be formed quickly, and "may[] be inferred from the use of a deadly weapon." *Anderson*, 361 So. 3d at 617 (alteration in original) (internal quotation mark omitted) (quoting *Sands v. State*, 62 So. 3d 374, 378-79 (Miss. 2011)).

  a. <u>Second-Degree Murder</u>

¶21. The intent required for second-degree murder is "an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020). The degree of malicious intent sufficient to constitute depraved-heart murder "can be inferred from the circumstances if the actions involved a very high degree of carelessness evincing a reckless indifference to the danger to human life." *Hawkins v. State*, 101 So. 3d 638, 642 (Miss. 2012) (internal quotation marks omitted) (quoting *Clark v. State*, 693 So. 2d 927, 930 (Miss. 1997)). Depraved-heart murder involves a degree of recklessness that is of such a high degree that malice may be implied. *Id.* at 643. When the evidence is clear and overwhelming that the defendant acted with deliberate design, or premeditation, a second-degree-murder instruction may lack an evidentiary foundation and therefore be improper. *Batiste v. State*, 121 So. 3d 808, 845-46 (Miss. 2013).

¶22.    In *Curtis v. State*, the Court of Appeals addressed a similar argument in which the defendant asserted that it was error to fail to instruct the jury on depraved-heart murder. *Curtis v. State*, 298 So. 3d 446 (Miss. Ct. App. 2020). In that case, the evidence showed that the victim had been beaten repeatedly and strangled. *Id.* at 452. The Court of Appeals noted that second-degree murder is characterized by a degree of recklessness and tends to be applicable when "a brief assault or reckless act . . . [produces] death without deliberate design." *Id.* In Curtis's case, he had beaten the victim repeatedly with a pool cue and revolver, and had strangled him; consequently, "there was no reasonable inference that the killing resulted from mere 'recklessness.'" *Id.* (quoting *Hawkins*, 101 So. 3d at 643). Instead, "the killing was the end result of a prolonged, brutal, and deliberate assault . . . ." *Id.* The Court of Appeals concluded that no reasonable juror could conclude that the act was merely reckless; thus, the depraved-heart-murder instruction was properly refused. *Id.*

¶23.    In his confession to police, Johnson admitted that he took parts off of Sherry, including her head, stating that "[w]e was fighting inside, you know, her head came off inside." He stated that he tried to use a knife to get her head off "[b]ut that didn't work, you know. So I was, I was like, you know, biting it and squeezing it." He additionally stated in both his confession to police and to his father that he choked her until she passed out, and then he pulled her head off. The injuries described in the autopsy were extensive and involved multiple stab wounds and blunt-force-trauma wounds, and also indicated strangulation. Johnson used knives in the attack. Stabbing, beating, and choking someone, culminating in ripping the person's head off their body, consists of fairly overwhelming

evidence of deliberate design, and cannot fairly be categorized as mere recklessness. Thus, the trial court did not err by refusing the depraved-heart-murder instruction.

### b. Heat-of-Passion Manslaughter

¶24. "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon . . . shall be manslaughter." Miss. Code Ann. § 97-3-35 (Rev. 2020). "Heat of passion" is

> [a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Batiste*, 121 So. 3d at 844 (alteration in original) (quoting *McCune v. State*, 989 So. 2d 310, 319 (Miss. 2008)). The circumstances must be such "that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Id.* (internal quotation mark omitted) (quoting *McCune*, 989 So. 2d at 319). Passion and anger alone do not suffice. *Id.* (citing *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001)). Mere words cannot constitute reasonable provocation. *Abyeta v. State*, 137 So. 3d 305, 311 (Miss. 2014) (quoting *Phillips v. State*, 794 So. 2d 1034, 1037 (Miss. 2001)).

¶25. Evidence exists that Johnson and Sherry were arguing over credit cards, and in his confessions, Johnson averred that Sherry bit him during the argument. Johnson also repeatedly stated that he "lost it" during the argument. First, as previously discussed, ample evidence exists of deliberate design, which would foreclose requiring a manslaughter instruction. *Batiste*, 121 So. 3d at 845. Second, no evidence exists of provocation sufficient

11

to rouse a normal mind into usurping judgment. In *Abyeta*, the defendant and his mother had argued about a debit card, and the defendant brutally beat and strangled his mother to death. *Abyeta*, 137 So. 3d at 309. Abyeta relied on evidence that he had told someone that he had "lost it" with his mother and an allegation that she had threatened to cut him off financially in support of his argument that a heat-of-passion-manslaughter instruction was warranted. *Id.* at 311 (internal quotation marks omitted). The Court found that reasonable provocation was absent. *Id.* In *Batiste*, the defendant alleged that the victim aggressively jabbed at him with a sword and called him names. *Batiste*, 121 So. 3d at 845. The Court found that, even if true, this was not reasonable provocation. *Id.* The Court noted that no injuries were observed on Batiste, and the victim's conduct would not rouse a normal mind to the extent that judgment was destroyed. *Id.* Likewise, no evidence exists that Johnson was injured by any alleged bite. And an argument about credit cards is mere words. Even the combination is not reasonable provocation that would rouse a normal mind to the extent that judgment would be destroyed. Thus, a heat-of-passion manslaughter instruction was not supported by the evidence, and the trial court did not err by refusing it.

*2.      Warrantless Search*

¶26.      In determining whether evidence should be suppressed, a trial court's findings of fact will not be disturbed on appeal absent a finding the trial court "applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence." *Simmons v. State*, 805 So. 2d 452, 482 (Miss. 2001) (quoting *Taylor v. State*, 733 So. 2d 251, 255 (Miss. 1999)). "As a general rule, our state and federal Constitutions prohibit searches without a valid warrant unless an exception applies." *Galloway v. State*, 122 So. 3d 614, 669 (Miss. 2013). Such exceptions typically include a consensual search, a search incident to arrest, an inventory search, and a search under exigent circumstances if probable cause exists. *Id.*

*Crawford v. State*, 192 So. 3d 905, 923 (Miss. 2015).

¶27.    Johnson argues that the warrantless search was unconstitutional, while the State argues that several exceptions apply to allow the admission of evidence from the warrantless search, namely, consent, inevitable discovery, and exigent circumstances.  Johnson argues that the consent was not knowing and voluntary because Captain Boggs misrepresented the law, and even if it was knowing and voluntary, Captain Boggs exceeded the scope of the consent when he opened the locked door to Sherry's bedroom.  He further argues that no exigent circumstances existed because no indication existed that Sherry was in danger at the time of the search.  Last, Johnson argues that the evidence would not be inevitably discovered because obtaining a search warrant based on prior domestic calls was not certain.

¶28.    "Voluntary consent eliminates the warrant requirement." *Moore v. State*, 933 So. 2d 910, 916 (Miss. 2006) (citing *Morris v. State*, 777 So. 2d 16, 26 (Miss. 2000)).  Consent must be knowing and voluntary, and the person consenting must know of his right to refuse.  *Id.* (citing *Penick v. State*, 440 So. 2d 547, 550 (Miss. 1983))  The burden is on the defendant to prove impaired consent or diminished capacity.  *Id.* (citing *Jones v. State ex rel. Miss. Dep't of Pub. Safety*, 607 So. 2d 23, 29 (Miss. 1991)).  In determining whether consent is valid, a court looks at the totality of the circumstances, considering

> whether the circumstances were coercive, occurred while in the custody of law enforcement or occurred in the course of a station house investigation. The court must also look to the individual's maturity, impressionability, experience and education. Further, the court should consider whether the person was excited, under the influence of drugs or alcohol, or mentally incompetent. If the consent occurred while the defendant was being generally cooperative, the consent is more likely to be voluntary; however, if the defendant agreed and then changed his mind, the consent should be suspect.

13

*Id.* at 916-17 (quoting ***Graves v. State***, 708 So. 2d 858, 863 (Miss. 1997)). This Court has further limited lack-of-knowledge cases to those in which the defendant specifically claims that he did not know of his right to refuse. ***Id.*** at 917 (citing ***Graves***, 708 So. 2d at 864).

¶29. Johnson initially requested a search warrant, indicating he knew of his right to refuse. The testimony and video indicate that Johnson was behaving normally and was generally acting cooperatively with officers, and he quickly and agreeably changed his mind and led officers into the house. Further, he changed his mind after officers requested his *permission* to enter the house, which strongly implies that they would not enter unless Johnson allowed their entrance. Johnson was not under arrest or handcuffed at the time. Johnson did not present any evidence indicating that his mental state was compromised at the time of the consent. Therefore, he failed to meet his burden of proving impaired consent or diminished capacity.

¶30. Johnson then argues that the initial consent was exceeded by Captain Boggs opening a locked door. But this Court need not address whether consent was exceeded, because the inevitable-discovery doctrine applies. The inevitable-discovery exception to the exclusionary rule for evidence obtained by an illegal or warrantless search applies when the evidence or information "inevitably would have been discovered by lawful means." ***Nix v. Williams***, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). Captain Boggs and Deputy Sharpe initially entered the house lawfully based on Johnson's consent. The body-camera video makes clear that when Captain Boggs opened the door to Sherry's bedroom and, in response, returned outside, Deputy Sharpe was still actively engaged in searching the back yard based

14

on the consent search. Had Captain Boggs not returned outside, it was inevitable that Deputy Sharpe would have found Sherry's headless body during his ongoing search of the back yard. He simply had not yet made it to the area where her body was located, but he had not concluded his search when Captain Boggs alerted him to the findings in the bedroom. Additionally, Sherry's head was found on the outside of the privacy fence, making it more susceptible to being found. And, at the point of finding Sherry's headless body, officers would have been able to obtain a search warrant even without the information found in the bedroom. Thus, the same evidence in the same condition would have been introduced at trial. Therefore, the trial court did not err by denying Johnson's motion to suppress.

*3. Body-Camera Video*

¶31. This Court reviews the admission or exclusion of evidence for abuse of discretion. ***Bonds v. State***, 138 So. 3d 914, 917 (Miss. 2014) (citing ***Grim v. State***, 102 So. 3d 1073, 1078 (Miss. 2012)). Johnson argues that allowing the jury to view the end of the video, which depicted family members acting extremely upset with him, was more prejudicial than probative. *See* MRE 403. Before publishing the video, which had been produced to Johnson in discovery, the trial court specifically asked his counsel if he had any objection to admitting it, and Johnson's counsel responded, "[n]one." The video was then admitted into evidence. Before reaching the end of the video, when it had about three minutes remaining, defense counsel objected to showing the portion of the video in which the family got upset. The trial court reiterated that defense counsel had received the video in discovery and that he had not

objected to its admission, but defense counsel explained that he had believed that the State was going to delete the end of the video.

¶32. Failure to make a contemporaneous objection generally waives any claim of error on the issue on appeal. *Hales v. State*, 933 So. 2d 962, 966 (Miss. 2006). In *Hales*, the State offered into evidence a photograph in a category prohibited by the pretrial order. *Id.* at 964-66. Defense counsel had received the photograph in discovery, had not objected to its admission into evidence after viewing it, and the direct examination of the admitting witness had been completed before defense counsel objected to the photo. *Id.* at 966. While both the trial court and this Court admonished the prosecutor for his admission of the photo against the pretrial order, this Court nonetheless found that the lack of contemporaneous and timely objection procedurally barred the issue from consideration. *Id.* at 966-67. Similarly, defense counsel here gave no objection to the admission of a video he had received in discovery, and only after the video was admitted and the majority of the lengthy video played did he object. Such an objection is not timely and contemporaneous, and the issue is procedurally barred on appeal.

*4.    Closing Statement*

¶33. During his closing statement, defense counsel gave the jury some history of the insanity defense. He then began to give a biblical reference, and the State objected. The trial court sustained the objection. In his motion for a new trial, trial counsel asserted that the two sentences he was prevented from saying were "Then said Jesus, 'Father, forgive them for they **know not what they do**. ' And they parted his raiment and cast lots." Johnson claims

16

that sustaining the objection prevented his counsel from fully presenting his theory of the case.

¶34. Counsel is given broad latitude in closing argument, and biblical references in closing arguments generally fall within that broad latitude. *Manning v. State*, 929 So. 2d 885, 906 (Miss. 2006). However, "[h]armless-error analysis prevents 'setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.'" *Smith v. State*, 136 So. 3d 424, 435 (Miss. 2014) (quoting *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). This Court need not determine whether limiting counsel's broad latitude was error because, even if it was, any such error was harmless. Defense counsel presented his theory of the case to the jury, giving a history of the insanity defense and discussing the evidence he presented of insanity. Johnson does not adequately explain why eliminating those two sentences from his closing arguments prejudicially prevented him from presenting his theory of the defense. This issue is without merit.

5. *Weight of the Evidence*

¶35. This Court reviews challenges to the weight of the evidence for abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). This Court weighs the evidence in the light most favorable to the verdict, and will only reverse the verdict when "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (internal quotation mark omitted) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).

17

¶36.    Johnson raised an insanity defense, and the issue was presented to the jury.  The jury failed to find Johnson not guilty by reason of insanity after considering the issue.  Johnson now argues that the jury verdict is against the overwhelming weight of the evidence of his insanity.

¶37.    In Mississippi, "[t]he determination as to a defendant's sanity is within the province of the jury, which may accept or reject expert and lay testimony." *Russell v. State*, 729 So. 2d 781, 784 (Miss. 1997) (citing *Tyler v. State*, 618 So. 2d 1306, 1309 (Miss. 1993)). Mississippi uses the *M'Naghten* test to determine insanity, which establishes that

> it must be clearly proved that at the time of committing of the act the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong.

*Roundtree v. State*, 568 So. 2d 1173, 1181 (Miss. 1990) (quoting *Hunter v. State*, 489 So. 2d 1086, 1090 (Miss. 1986)).

¶38.    Both Johnson's expert and the State's expert agreed that Johnson had a disease of the mind.  Johnson's expert testified that he was so paranoid and delusional that he believed he was justified in killing his mother.  But she also testified that he believed he was killing his aunt and knew he was killing a human being.  The State's expert admitted that some evidence of insanity existed, but opined that more evidence of sanity existed.  Johnson's behavior around the time of the crime and the mental evaluations of him led the State's expert to conclude that Johnson was legally sane and knew that his act was wrong.  While certainly some evidence of insanity existed, evidence of legal sanity is also contained in the record, and the evidence of insanity is not so overwhelming that allowing the verdict to stand

18

sanctions an unconscionable injustice. The conflicting evidence and testimony were within the jury's province to weigh, and not enough evidence of insanity exists for this Court to overturn the jury's verdict. This issue is consequently without merit.

## CONCLUSION

¶39. Because no reversible error occurred in this case, this Court affirms Johnson's conviction and sentence.

¶40. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, P.J., ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**