# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01143-COA

**ERBY JACKSON, JR. A/K/A ERBY D. JACKSON, JR. A/K/A ERBY DEAN JACKSON, JR.**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/07/2022 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA B. CHAMBERLAIN ERBY D. JACKSON JR. (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/21/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., GREENLEE AND WESTBROOKS, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     A jury convicted Erby Dean Jackson Jr. of first-degree murder and burglary in the Marshall County Circuit Court.  The circuit court sentenced Jackson as a violent habitual offender to life in prison without eligibility for early release, probation, or parole.  Jackson appeals.  We affirm the trial court's judgment of conviction and sentencing.

## FACTS AND PROCEDURAL HISTORY

¶2.     On September 5, 2020, shortly after midnight, 911 dispatch received a call regarding vehicle headlights that were shining in the caller's home window.  Upon arriving at the

scene, officers found Jennifer Marie Irby-Melgoza inside a truck that had crashed into a tree. She was covered in blood when the officers arrived and appeared to have a stab wound to her chest.

¶3.     The officers on the scene developed Jackson as a suspect after examining the truck's contents.  Inside the truck, they found a wallet that contained Jackson's driver's license, his social security card, and other cards with his name on them.  They also found two medicine bottles with Jackson's name on them in a backpack inside the truck.  While continuing to process the scene, they located a Bible in a black purse near the residence where the truck struck the tree.

¶4.     After spending a few hours examining the scene, Major Kelly McMillen left and passed by Chewalla Primitive Baptist Church, which was near the scene of the crash.  He noticed lights on in the church and thought this was suspicious.  McMillen stated he had been to the church several times with Donald Ash, who is the deacon of the church, and said that Ash "don't leave the lights on."  McMillen along with Detective Perry Pipkin, who had also been at the scene of the crash, entered the church and found no one there.  They did not investigate the church at this time and, instead, simply "cleared it for security purposes" to make sure no one was inside.

¶5.     Around the same time, Lieutenant Eric Knox, another officer who had been at the initial crash scene, passed Temperance Hill Baptist Church, which is about "three or 400 yards" from Chewalla Primitive Baptist Church.  Knox observed a white male sitting on the

front porch of the church. Because McMillen and Pipkin were still in the area near Chewalla Primitive Baptist Church, they advised they were going to Temperance Hill Baptist Church once Knox located a man he believed may have been Jackson.

¶6.     Knox approached Jackson and advised him to lie on his stomach. Knox put Jackson in handcuffs and testified that Jackson did not resist in any way and seemed normal and coherent. Pipkin testified that upon arriving to Temperance Hill Baptist Church, Jackson was cooperative, responded appropriately to the commands given, seemed to comprehend what was being said, and acted accordingly.

¶7.     Jackson was then transported to the Marshall County Sheriff's Department. The jail administrator, Oscar Phillips, testified that when he got to work around 6 a.m., Jackson was already there in custody. Phillips testified that around 3 p.m. that same day, he was "in the tower" but "observed [Jackson] up front from the cameras." Phillips stated that he could see Jackson (on the cameras using) "a lot of hand language" and "just moving his hands and all that." This observation prompted Phillips to go to where Jackson was. Once Phillips got to Jackson, he "was just talking real loud and crazy," so officers "removed him from the front to the back." Due to Jackson's behavior, Phillips and another officer took Jackson to a cell, and they had to force him into it because he did not want to go. Phillips testified that later on Jackson calmed down, but before he did, they had already made the decision to send him to the Benton County jail. Phillips said they made that decision because Jackson was "talking crazy," saying, "I'll hurt you, I'll kill you, I'll kill myself," and they "didn't want

3

him to hurt hi[m]self."

¶8.    Phillips further testified that while in custody at the Marshall County Sheriff's Department, Jackson would sometimes act out. He stated that Jackson would "have his days." When he would have "one of those days," Jackson would "get mad and get upset and get angry, banging on the door, kicking the door." Phillips testified that when Jackson was around a lot of people, he tended to act out a little bit. However, when he was around very few people, he was okay. When asked, Phillips agreed that more recently Jackson's behavior had been "amiable, approachable, [and] easy to deal with." Phillips stated that often Jackson would call Phillips or another officer over to talk because "he just want[ed] somebody to talk to."

¶9.    A few hours after Jackson was transported to the Marshall County Sheriff's Department, McMillen and Sheriff Kenny Dickerson interviewed Jackson. Once the interview concluded, McMillen and Sheriff Dickerson went to Chewalla Primitive Baptist Church and located the knife in the pulpit, which was exactly where Jackson stated it was in the interview. The knife appeared to be clean and was sent for DNA testing.

¶10.   Irby-Melgoza's autopsy report confirmed that she had been stabbed in her chest. Mark LeVaughn, M.D., a medical examiner at the state crime laboratory, testified during the trial that the track of the stab wound penetrated her heart, which caused her to bleed to death. Dr. LeVaughn examined the knife that the officers found in the pulpit at Chewalla Primitive Baptist Church and testified that it could have produced the wound in Irby-Melgoza's chest.

4

Dr. LeVaughn explained that based on the testing done on the knife, the state crime lab was able to identify biological matter on the knife even though there was no visible blood on it.

¶11.    George Schiro, the crime lab's DNA analyst who actually conducted the testing of the biological matter on the knife, did not testify; instead, McMillen was re-called to the stand to testify and confirm what the DNA report discovered. McMillen testified that there was a positive match between evidence found on the knife and the buccal swab conducted for the DNA report. McMillen stated that the report indicated Irby-Melgoza's blood was found on the knife by DNA analysis. McMillen also stated that the clothing that Jackson was wearing was sent to the crime lab along with the knife, and the report confirmed Irby-Melgoza's blood was on some of these items of clothing as well.

¶12.    Dr. LeVaughn further testified in the trial court proceedings that Irby-Melgoza had cut wounds on her right hand that were consistent with defensive cuts, which are injuries that occur if someone were trying to attack a person who put up his hands or tried to push the other person off him. Irby-Melgoza's toxicology report that had been prepared with the autopsy report showed that she had methamphetamine and marijuana in her system. Dr. LeVaughn concluded in his testimony that the manner of Irby-Melgoza's death was a homicide by a stab wound.

¶13.    On July 25, 2022, a Marshall County grand jury indicted Jackson as a violent habitual offender for first-degree murder and burglary. Before his trial, Jackson moved to dismiss his indictment and to suppress statements made to law enforcement.

¶14.    First, he argued that his indictment was defective because it failed to comport with the mandatory statutory requirements under Mississippi Code Annotated section 99-7-9 (Rev. 2020) because it lacked the grand jury foreman's signature, the clerk's signature, and an indication that it was filed, and it included habitual-offender information from a different defendant's indictment.  The trial court held that this was a scrivener's error and denied Jackson's assertion.  Further, the trial court granted the State's motion to amend the indictment and allowed the portion of another defendant's indictment to be deleted.

¶15.    Second, he argued that his admissions and statements made to law enforcement should be suppressed because they failed to obtain a valid waiver.  He claims he was not properly given his *Miranda*[1] warnings, he did not sign a written consent prior to being interviewed by law enforcement, and his interviews were not recorded.  He requested the trial court to rule that any statements derived from those interviews would be suppressed.

¶16.    During the suppression hearing, McMillen testified that after Knox handcuffed Jackson, McMillen verbally advised Jackson of his *Miranda* rights.  Jackson responded that he understood his rights.  He did not say he waived his rights, but he said he understood them and answered McMillen's questions that followed.  The other two officers on the scene, Knox and Pipkin, both testified they heard "with [their] own ears" McMillen reading Jackson his *Miranda* rights.  McMillen and Knox both radioed dispatch to confirm Jackson had been read his *Miranda* rights.  This radio traffic by both officers was recorded (per usual policy)

_____

    [1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

and documented through their CAD system, which is the system dispatchers use to record this information in document form. Both the audio recording and the CAD report were admitted into evidence at trial.

¶17. After informing Jackson of his *Miranda* rights, McMillen asked Jackson if he had broken into the Chewalla Primitive Baptist Church. Jackson admitted that he did and said that he took a Bible from there "because he wanted to do some reading." When he was asked if he knew what had happened to the woman found dead in the truck across the road, he said no.

¶18. Later in the morning, once Jackson was in custody at the Marshall County Sheriff's Department, McMillen and Dickerson interviewed Jackson in an investigative office. Before the questioning began, Dickerson asked Jackson if he still understood his *Miranda* rights that had been previously given to him on the scene earlier by McMillen, and Jackson responded that he did. Dickerson then asked Jackson if he knew what had happened to the woman found dead in the truck, and after hesitating for a few minutes, Jackson replied, "I stabbed her." During this same interview, Jackson told McMillen and Dickerson that the murder weapon was located inside the pulpit of the Chewalla Primitive Baptist Church. Jackson further stated that he and Irby-Melgoza had used methamphetamine and were in the area to buy drugs.

¶19. When transferring Jackson from the investigative office to the interview room with audio-video recording equipment, Jackson "completely shut down" and told the officers he

was not answering any further questions or signing a waiver. At this point, Jackson was escorted back to his jail cell. McMillen testified that getting suspects to sign a waiver is something they do, but when working on a homicide case, there is more of a sense of urgency. McMillen said that in this particular situation, they were trying to get the information as quickly as possible.

¶20. After McMillen's testimony during the suppression hearing, Jackson still asserted that the procedural safeguards of *Miranda* were not followed before Jackson was questioned. He also argued that there was no evidence to support a finding that he understood his rights.

¶21. The trial court ultimately denied Jackson's motions and found that "the unrefuted testimony is that McMillen did advise Mr. Jackson of his *Miranda* rights and he understood them." The trial court found that this evidence was supported by two other officers who were eyewitnesses to the oral warnings, as well as the dispatch recording and the CAD report. Further, the trial court found that Jackson acknowledged his rights had been read to him and confirmed that he understood them. The trial court concluded that the State met its burden of proof and was "in compliance with the constitutional requirements regarding *Miranda* and have met those [requirements]." At this point, the hearing regarding the motions concluded, and voir dire examinations began.

¶22. During Jackson's trial, William Criss Lott, M.D., testified regarding his mental evaluation of Jackson he conducted about eight months after the crime occurred. Dr. Lott is a clinical and forensic psychologist in Mississippi. During his evaluation of Jackson, he

inquired, among many things, about Jackson's mental health history and his behavior at the time of the offense.

¶23.    For the purpose of the evaluation and to ensure he got a full understanding of Jackson's behavior leading up to the offense, Dr. Lott also spoke with Jackson's father and federal probation officer. Jackson's father told Dr. Lott that "he kn[e]w that Mr. Erby [Jackson] and the victim had been using drugs." Jackson was under the supervision of his federal probation officer at the time of the index offenses. Jackson's federal probation officer told Dr. Lott that when she spoke with Jackson, most of the time "he was coherent, but there were times when I talked to him that he was all over the place." She also said that he had previously failed a drug screen that was positive for methamphetamine and admitted to drug use throughout his supervision, but his drug screen during the month of the offense was negative.

¶24.    When his federal probation officer took the stand at trial herself, she testified that Jackson could always articulate what was going on with him, and he seemed to understand everything she was saying. Jackson expressed to his federal probation officer that he believed people were out to get him and that he was trying to self-medicate.

¶25.    Dr. Lott explained, without objection, the *M'Naghten* standard to the court as the one followed in Mississippi in this context.[2] Dr. Lott testified that he understood the *M'Naghten* standard to address "whether or not someone suffers from a defective reason due to a disease

---

[2] *M'Naghten's Case*, 8 Eng. Rep. 718 (1843).

of the mind such that they do not know the nature and quality of their actions or if they did know, they did not know that the actions were wrong." Dr. Lott also explained to the court that if he believed the psychosis was drug-induced through voluntary intoxication and not predicated solely on a mental illness or disorder, it would not fall under the rubric of *M'Naghten*.

¶26. Dr. Lott's report of his evaluation of Jackson reflects that Jackson told him "he had not used any drugs . . . on the day of the offenses." However, Jackson did admit that "he had been using drugs heavily prior to the index offenses" and "had used a half of gram of methamphetamine a couple of days before the offenses." Jackson also told Dr. Lott that he and Irby-Melgoza "got up that morning and she wanted to go to Byhalia and get some drugs." Dr. Lott reported that Jackson admitted he began using methamphetamine at the age of sixteen and used it heavily at periods throughout his life, including when he was released from federal prison. He also admitted he began using heroin when he was released from prison. Further, Jackson told him that about ten years ago, he "went on a bender" and tried to kill himself because he "was hallucinating" after "using methamphetamine heavily."

¶27. Dr. Lott also testified that he reviewed the police report indicating Jackson was responding appropriately and acting rationally when he was arrested and while in jail. Dr. Lott opined these actions supported his ultimate findings in the evaluation because his psychotic behavior quickly resolved and significantly improved; therefore, his behavior was likely drug-induced. However, no drug screen was administered on Jackson following the

offenses or during his evaluation. Even absent proof of intoxication, Dr. Lott believed there was nothing in the interview "that appears the least bit psychotic in any of his comments or statements, nor in his behavior." Dr. Lott explained that the *M'Naghten* standard, in his view, does not require "to have a drug screen" conducted to prove or disprove the existence of substance use, "but it does say that it's not considered to be a product of a mental disorder if it's basically drug-induced."

¶28. After doing a thorough evaluation of Jackson including his mental history and his substance-abuse history and hearing from people who were around Jackson during the time leading up to the offenses, Dr. Lott reported that in his "opinion, to a reasonable degree of psychological certainty, Mr. Jackson was suffering from a severe mental disorder at the time of the index offenses. It appears he was suffering from a drug-induced psychotic disorder . . . ." He also reported that Jackson "had been using drugs heavily prior to the index offenses" and had "been exhibiting delusional behavior for several weeks before the index offenses" for which "he had not received any treatment for his substance abuse and psychotic symptoms." Dr. Lott stated that in his opinion, "Jackson believed he was killing a demon and did not believe that his actions were wrong."

¶29. Dr. Lott opined that Jackson was mentally ill at the time of the offense, but it was more likely than not that he experienced a drug-induced paranoid and psychotic state caused by the amount of drugs he used for several weeks prior to that moment and, thus, would not meet the standard for *M'Naghten*. Further, Dr. Lott believes "that but for th[e] amount of

subs[tance] abuse leading up to this," there was nothing in Jackson's mental health history to suggest that Jackson would have exhibited this type of behavior.

¶30. Toward the end of trial, Jackson testified in his own defense to the events that transpired leading up to Irby-Melgoza's murder. Jackson testified that after his release from federal prison, he had a hard adjustment phase and thought he died while he was in prison and that he was now in purgatory. He believed that people around him such as his co-workers were trying to kill him.

¶31. The day before Irby-Melgoza's murder, she and Jackson left his motel in Memphis, Tennessee, and drove to Marshall County, Mississippi. They were in Irby-Melgoza's truck and she was the one driving. Jackson testified that he "started getting nervous," so he asked her to let him out of the truck. Before getting out of the truck, he armed himself with a knife that he had in his backpack. He got out of the truck and began to walk around to different places in the area and Irby-Melgoza was following him around in the truck. One of the places he went while walking around was to a local man's house, Ganus Gadd. While in front of Gadd's house, Jackson pulled down his pants and got down on his knees, telling Gadd, "I'm your son." Irby-Melgoza was still continuing to follow Jackson in her truck and was in the area at the time this happened.

¶32. After Jackson left from the front of Gadd's house, he continued walking around the area; all the while, Irby-Melgoza was following him in the truck trying to get him to get in. Jackson testified it was freaking him out and he did not want to get in the truck. Jackson

further testified that he began to get thirsty, so he went to Chewalla Primitive Baptist Church and went inside to the kitchen and drank some water. As he was leaving the church, he saw a Bible "just laying there"; his mind told him he "had to protect the word of God," so he took the Bible. Jackson testified that this Bible was indeed the one found near the scene of the crash.

¶33. Once Jackson exited the church, Irby-Melgoza was parked in front of the church telling Jackson to get in the truck. Jackson testified he told her he did not want to get in the truck, "and that's that." When asked on the stand why he did this, he responded by saying, "[B]ecause I thought she was a demon trying to take me to the center of the lake of fire. I thought my soul was in danger." Jackson did not testify as to how the stabbing occurred exactly, but it is clear from his testimony that Irby-Melgoza was sitting inside the truck outside the church trying to get him to get inside the vehicle, and because he did not want to get in, he approached the driver's side of the truck and stabbed Irby-Melgoza.

¶34. After stabbing Irby-Melgoza, Jackson continued to wander around the area, going to multiple places, including briefly going back to Chewalla Primitive Baptist Church and stopping at houses in the neighborhood, knocking on their doors. Eventually, he made his way to Temperance Hill Baptist Church, where he went to sleep outside.

¶35. Jackson testified he could not say whether he properly received his *Miranda* warnings because he did not remember. He stated there was no interaction between him and the officers; they just detained him and threw him in the vehicle. However, Jackson testified that

13

he did remember being interviewed at the sheriff's department and believed he (Jackson) did what he was supposed to do.

¶36. The jury ultimately found Jackson guilty of first-degree murder and burglary, and the trial court sentenced him as stated above and denied his post-trial motion. He now appeals, raising various issues we address below.

## DISCUSSION

### I. Fatally Defective Indictment

¶37. Jackson argues that his indictment was defective because it failed to comport with the mandatory statutory requirements under Mississippi Code Annotated § 99-7-9. He argues that the trial court erred by not dismissing the defective indictment and instead deemed the fatal deficiencies as scrivener's error. Jackson suggests the indictment is defective because "the State simply took the signature page from a completely different case and attached it to Jackson's incomplete indictment to circumvent applicable statutory requirements."

¶38. "Whether an indictment is fatally defective is an issue of law and deserves a relatively broad standard of review. The legal sufficiency of an indictment must be reviewed de novo." *Payne v. State*, 282 So. 3d 432, 436 (¶13) (Miss. Ct. App. 2019). Section 99-7-9 requires that "all indictments and the report of the grand jury must be presented to the clerk of the circuit court by the foreman of the grand jury or by a member of such jury designated by the foreman, with the foreman's name endorsed thereon . . ." and that "the endorsement by the foreman, together with the marking, dating, and signing by the clerk shall be the legal

14

evidence of the finding and presenting to the court of the indictment." *McCormick v. State*, 377 So. 2d 1070, 1074 (Miss. 1979). If these statutory requirements are not met, "it is proper to demur to such an indictment and the demurrer should be sustained." *Jones v. State*, 356 So. 2d 1182, 1183 (Miss. 1978); *see* Miss. Code Ann. § 99-7-21 (Rev. 2020).

¶39.    Any "error is merely procedural where the facts reveal that the indictment was returned by the grand jury and not manufactured by the State." *Cochran v. State*, 969 So. 2d 119, 123 (¶16) (Miss. Ct. App. 2007); *see also Watts v. State*, 828 So. 2d 835, 842 (¶15) (Miss. Ct. App. 2002).

¶40.    In this instance, Jackson's indictment omitted a signature block that would have contained the statutorily required foreman's signature, clerk's signature, marking, and date. Instead, the indictment contained entries and endorsements attached to it from another indictment in a different case, involving a defendant by the name of James Earl Dortch, Jr.

¶41.    At the motion hearing, the State argued that the indictment was Jackson's original grand jury indictment that came down on July 25, 2022. The State asserted during this hearing that the section of the third page that discusses a different defendant's habitual enhancement was a scrivener's error and even offered to show the trial court the other defendant's indictment to prove it was nothing more than a "typographical" or "scrivener's error." Dortch was the defendant whose grand jury hearing was immediately following Jackson's and therefore, was heard by the same grand jury. Thus, it can be inferred that the foreman's signature that was taken from Dortch's indictment was the same foreman in

15

Jackson's case.

¶42. Jackson argues that "the indictment, on its face, indicates that the State simply took the signature page from a completely different case and attached it to Jackson's indictment to circumvent applicable statutory requirements." Further, he asserts that "removing information regarding Dortch from what is clearly Dortch's signature page was substantive and did not cure the error with respect to the deficiency in Jackson's indictment."

¶43. However, Jackson failed to show that the indictment in the record was not returned by the grand jury and was manufactured by the State. The filing of Jackson's indictment in the Mississippi Electronic Courts (MEC) system shows that the original indictment was filed, and we take judicial notice of that, as it is "readily available via MEC and cannot reasonably be disputed." *Teal v. Jones*, 222 So. 3d 1052, 1058 (¶21) (Miss. Ct. App. 2017). Jackson's indictment sufficiently complied with the requirements of section 99-7-9 because it contained the grand jury foreperson's signature, the signature of the clerk, the date, and the "marking" that it was filed on July 25, 2022. Jackson's indictment that was filed in the MEC system is the original indictment that included Dortch's information. Once the trial court granted the State an amendment to the indictment, the State deleted the portion of the indictment that included Dortch's information and copied and pasted the foreman's signature and the other necessary information to make the document complete. This further shows that the error was merely procedural because the indictment in the record was returned by the grand jury and not manufactured by the State. The error was not substantive to Jackson's actual indictment,

16

and the amended indictment by the State cured the error.

¶44.	Thus, the trial court made no reversible error in finding that this was a scrivener's error and ordering the indictment be amended and the portion related to the other defendant be deleted.  Therefore, we find the trial court did not err by denying Jackson's motion to dismiss.

## II.	Waiver of *Miranda* Rights

¶45.	Jackson argues that considering the question of his sanity at the time of the alleged offense, he could not have given a knowing and intelligent waiver of his rights.  Even though he raises this issue for the first time on appeal and thus did not properly preserve the issue, we will address this issue under the plain error doctrine.

¶46.	"Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right. For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Burdette v. State*, 110 So. 3d 296, 303 (¶23) (Miss. 2013).  "When reviewing a trial court's denial of a motion to suppress, an appellate court employs a mixed standard of review. . . . [A] trial court's decision to admit or exclude evidence is reviewed under the abuse-of-discretion standard." *Green v. State*, 344 So. 3d 854, 856-57 (¶9) (Miss. 2022) (citations and internal quotation marks omitted).

¶47.	"The Fifth and Fourteenth Amendments' prohibition against compelled self-

incrimination requires that the accused be advised of his right to remain silent and his right to counsel before any custodial interrogation. Once advised of his *Miranda* rights, an accused may waive these rights and respond to interrogation." *Moore v. State*, 287 So. 3d 905, 912 (¶20) (Miss. 2019). "For a waiver of one's *Miranda* rights to be considered valid, the state must prove beyond a reasonable doubt that the waiver was made voluntarily, knowingly and intelligently." *Chim v. State*, 972 So. 2d 601, 603 (¶8) (Miss. 2008). "A waiver is considered voluntary if it is the result of a free and deliberate choice rather than intimidation, coercion or deception." *Id*. "A waiver is knowing and intelligent if it is made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

¶48. "The trial judge sits as the trier of fact and must determine whether the incriminating statement was freely and voluntarily given." *Id*. at 604 (¶10). "The judge should determine whether the criminal defendant was advised of his rights, including the right against self incrimination as set forth in *Miranda*." *Id*. As the trier of fact, "the judge should ascertain, under the totality of the circumstances and beyond a reasonable doubt, that the defendant's statement was freely and voluntarily given, and was not the result of force, threat, or intimidation." *Id*.

¶49. In one case, a defendant argued "that the waiver of her *Miranda* rights was involuntary because she was intoxicated at the time." *Cruz v. State*, 305 So. 3d 149, 162 (¶38) (Miss. Ct. App. 2020). In that case, we found that "the trial judge did not err by

denying Cruz's motion to suppress." *Id*. at 163 (¶45). There "three law enforcement officers testified that nothing about Cruz's demeanor or appearance indicated that she was intoxicated or impaired, let alone to the point that she could not voluntarily, knowingly, and intelligently waive her rights." *Id*. Further, there was evidence produced to show that at least two hours had passed from the time Cruz had taken her last drink to the time she waived her *Miranda* rights. *Id*. at 164 (¶45).

¶50. The evidence presented at the present trial does not signify that Jackson did not voluntarily waive his *Miranda* rights and consent to speak with McMillen and Dickerson. McMillen testified that Jackson was acting normal at the time of his arrest when he waived his rights and willingly spoke to the law enforcement. McMillen also testified that Jackson twice acknowledged that he understood his rights he was waiving prior to giving any statements. The first time was when he was handcuffed on the scene and the second time was right before the interview was conducted at the sheriff's department. McMillen further testified that Jackson followed Knox's instructions and acknowledged that he knew what was going on when he was arrested moments before McMillen advised Jackson of his rights.

¶51. Later in the trial, Dr. Lott testified that he reviewed Jackson's statements to law enforcement during his interview. Dr. Lott testified that "there's nothing that appears the least bit psychotic in any of his comments or statements, nor in his behavior." He noted that if law enforcement observes a suspect exhibiting strange or bizarre behaviors during an interview then they will cease the interrogation, but that did not happen here.

19

¶52. Even though the State has asserted that Jackson's mental state at the time of the murder was one of a drug-induced psychosis, when he was arrested and then later interviewed, many hours had passed since the murder occurred. This is similar to *Cruz* where at least two hours had passed before Cruz waived her *Miranda* rights, except in the present case, even more hours than that had passed from the time of the murder to the time Jackson was read his *Miranda* rights and began voluntarily answering law enforcement's questions. Further, Dr. Lott testified that it was clear Jackson's psychosis state improved quickly and significantly from the time before and during the murder compared to the time he was arrested and interviewed because by that time it had been about 24 to 48 hours or more since Jackson had ingested any drugs.

¶53. Thus, we find no reversible error in the court's ruling denying Jackson's motion to suppress the statements he made to law enforcement. He made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

### III. Jury Instructions

¶54. Jackson's next argument is that the trial court erred by refusing to give his proposed jury instructions on insanity as a defense and imperfect self-defense manslaughter. This Court reviews the giving or refusing of jury instructions under an abuse-of-discretion standard. *Jenkins v. State*, 371 So. 3d 593, 596 (¶17) (Miss. 2023). "The jury instructions are to be read as a whole, with no one instruction to be read alone or taken out of context." *Id.*

20

### A. Insanity Defense

¶55. Mississippi follows the *M'Naghten* standard for determining whether a person was sane at the time he or she committed the crime. *Woodham v. State*, 800 So. 2d 1148, 1158 (¶28) (Miss. 2001). Under that test, the accused must be "laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong." *Id.* "The determination as to a defendant's sanity is within the province of the jury, which may accept or reject expert and lay testimony." *Tyler v. State*, 618 So. 2d 1306, 1309 (Miss. 1993). A defendant is presumed sane until there is a reasonable doubt about his sanity. *Hearn v. State*, 3 So. 3d 722, 738 (¶47) (Miss. 2008). Once such doubt is raised, "the State bears the burden to prove the defendant's sanity beyond a reasonable doubt." *Id.* "A trial court may withhold an insanity instruction 'if it concludes that the relationship between a defendant's mental illness history and his criminal conduct has not been explained or examined in any meaningful way.'" *Id.* at 739 (¶51).

¶56. The evidence presented at trial showed that Jackson admitted to using drugs around the time of the murder. Further, Dr. Lott testified that Jackson had been using drugs heavily in the weeks leading up to the murder. Although no evidence shows Jackson had taken drugs the day of the murder, the timing of his taking the drugs is not dispositive of this issue. Dr. Lott testified that Jackson's heavy drug use in the weeks leading up to the murder clearly supported his conclusion that Jackson was in a drug-induced paranoid and psychotic state

21

when he stabbed Irby-Melgoza. Dr. Lott also testified that nothing in Jackson's mental history would have caused this except for the drug-induced psychosis.

¶57. Jackson's actions following the crime provided evidence that he acted rationally and reasonably, which further supported the inference that he was in a drug-induced psychosis at the time of the murder. After stabbing Irby-Melgoza, Jackson disposed of the knife in the pulpit inside Chewalla Primitive Baptist Church. The knife appeared to have been wiped clean because there was no DNA or visible blood; however, the testing conducted on the knife confirmed that Irby-Melgoza's blood was on the knife. These facts support the idea that Jackson was of sound mind when the murder occurred because he was sure to wipe the knife clean of any visible evidence before disposing of it in the pulpit.

¶58. At the time of his arrest, none of the officers had any concerns or suspicions of Jackson's mental state at the time because he complied with Knox's commands and was taken into custody without any incident. Jackson also voluntarily waived his *Miranda* rights that were given to him verbally by McMillen and acknowledged multiple times to more than one officer that he understood his rights. McMillen testified that during Jackson's interview "he wasn't having any problems or anything," and "he was acting normal" in his opinion.

¶59. Dr. Lott noted that Jackson's actions must have been drug-induced by ingesting substances around the time of the murder because he acted reasonable after his arrest and in jail, and "his behavior [was] improving significantly" after his arrest, which would have been about 24-48 hours after ingestion. Jackson's probation officer also testified that Jackson

22

understood their conversations, one of which occurred two days before the murder.

¶60.    Here, the evidence is insufficient to create a reasonable doubt of sanity. The evidence showed that Jackson was suffering from a mental illness. But mental illness by itself does not constitute legal insanity. *Tyler*, 618 So. 2d at 1313. Instead, Jackson admitted to using drugs heavily before the crime, which supported Dr. Lott's testimony that Jackson was suffering from a long-standing psychosis from drug usage when he murdered Irby-Melgoza.

¶61.    The trial court did not err by refusing Jackson's proposed insanity instruction because the evidence showed that Jackson's voluntary intoxication, not any mental illness, caused his psychotic behavior. The trial court acted within its bounds to deny the instruction on an insanity defense because the relationship between Jackson's "mental illness history and his criminal conduct [were not] explained or examined in any meaningful way." *Hearn*, So. 2d 3d at 739 (¶51). Thus, the trial court did not abuse its discretion in refusing the instruction.

### B.    Imperfect Self-Defense

¶62.    "[U]nder the theory of imperfect self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Brown v. State*, 222 So. 3d 302, 307 (¶21) (Miss. 2017). There must be evidence that the defendant "subjectively" believed "in his or her own mind" that they were in imminent danger of death or great bodily harm. *Id.*

¶63.    This Court has recently reviewed a case in which we reversed and remanded for a new trial on the issue that a defendant's proposed imperfect-self-defense instruction should have

been given. *Skinner v. State*, No. 2022-KA-00622-COA, 2023 WL 5922082 (Miss. Ct. App. Sept. 12, 2023). In this case, Skinner believed that something had happened to his former girlfriend, whom he referred to as his "child's mother" even though they did not have children together. *Id*. at *1, 13 (¶¶4, 67). Skinner believed that the victim was "using two phone apps" to make it seem like she was communicating with Skinner's ex-girlfriend's current boyfriend to check on the ex-girlfriend for Skinner. *Id*. at *8 (¶42). Skinner testified that he became scared for his ex-girlfriend and his child, so he grabbed a nearby shotgun, and after a brief struggle over the gun, shot the victim. *Id*. Skinner testified that he shot the victim because "'he was scared for his life'; he acted out of fear, not malicious intent." *Id*. at (¶43). Skinner testified that he killed the victim because he thought the victim was the devil. *Id*. at (¶44).

¶64.	In *Skinner* we concluded that the trial court erred by refusing Skinner's imperfect self-defense instruction because "a reasonable juror could have found Skinner acted out of fear, not malice, and that while Skinner sincerely believed shooting Anderson was 'necessary to prevent great bodily harm,' his belief was 'unfounded,' as it was based on [Skinner's] overwhelming (but perhaps paranoid or delusional) belief that Anderson was 'the devil' and wanted to kill him." *Id*. In the partial dissent, the argument was made that a mental evaluation should have been conducted to determine if Skinner was mentally competent, but one was not conducted. *Id*. at *19 (¶102) (McCarty, J., concurring and dissenting in part).

¶65.	In the present case, the evidence presented at trial did not show that Jackson killed

24

Irby-Melgoza under a bona fide but unfounded belief that killing her was necessary to prevent his own death or bodily harm. There was testimony given that Jackson armed himself with a knife before getting out of Irby-Melgoza's truck. Jackson testified he did so because he was scared because he "didn't know where [he] was" and felt like he needed protection. Jackson also testified that when he exited the church, Irby-Melgoza was in her truck in the parking lot "screaming at [him], [to] get in the truck" and he told her, "I don't want to get in the truck." Instead of admitting to stabbing her, Jackson then testified, "And that's that." What he did not explain is that to stab Irby-Melgoza, he had to approach her truck, reach into the truck, and stab her. This was not evidence that Jackson believed killing Irby-Melgoza was necessary to prevent his own death or bodily harm. If he felt Irby-Melgoza was threatening imminent danger of death or bodily harm, he would not have willingly approached the truck to put himself in a more likely position to be harmed.

¶66. The present case seems similar to *Skinner* at first glance because, in both cases, the accused believed the victim was a demon/devil. Also similarly, in *Skinner*, there was evidence that Skinner and the victim "were using drugs the evening before the shooting." *Id*. at *1 (¶3). However, there are a couple of significant differences between the two cases. In the present case, regardless of whether Jackson took drugs around the time of the murder, Dr. Lott testified that Jackson was in a drug-induced psychosis. Dr. Lott repeatedly testified that if it were not for Jackson's drug-induced psychosis, Irby-Melgoza's murder would not have happened. Further, in the present case, unlike in *Skinner*, a thorough mental evaluation

25

was conducted on Jackson by Dr. Lott, in which he reported, "to a reasonable degree of psychological certainty, that Mr. Jackson has sufficient present ability to confer with his attorney with a reasonable degree of rational understanding and he has a factual and rational understanding of the nature and object of the legal proceedings against him."

¶67.   Thus, the trial court properly refused Jackson's proposed instruction for imperfect self-defense because Jackson's actions were the result of drug-induced psychosis from his long-standing use of drugs, not that he was under a bona fide belief that killing the victim was necessary to prevent his death or bodily harm.

###        IV.    Weight of the Evidence

¶68.   Jackson argues that the jury's guilty verdicts for both the first-degree murder conviction and the burglary conviction were against the overwhelming weight of the evidence. When a defendant raises a weight-of-the-evidence challenge in a motion for a new trial, we ask whether the trial court abused its discretion in granting or denying a new trial. *Little v. State*, 233 So. 3d 288, 292 (¶¶21-22) (Miss. 2017). Our review is limited, and we "weigh the evidence in the light most favorable to the verdict, only disturbing a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.

###        A.    First-Degree Murder

¶69.   Jackson argues that the jury's verdict convicting him of first-degree murder was against the overwhelming weight of the evidence because "there was no evidence that [he]

26

was intoxicated on the date of the incident"; instead, he contends the "evidence indicates that [he] stabbed the decedent out of fear and paranoia and while suffering from severe mental disorder." To convict Jackson of first-degree murder, the State had to prove beyond a reasonable doubt that Jackson killed Irby-Melgoza without authority and with deliberate design to effect the death of Irby-Melgoza. Miss. Code Ann. § 97-3-19(1)(a). He asserts his claim that he killed Irby-Melgoza because he thought she was a demon trying to drag him to hell, which Jackson believes proves there was no deliberate design to effect Irby-Melgoza death.

¶70. At trial, the jury heard evidence that Jackson was in a drug-induced psychosis at the time of the murder. They also heard conflicting testimony about whether Jackson was on drugs at the time of the murder because there was no drug screen performed on Jackson after he was in custody (or at any time following). This included Jackson's admission to Major McMillen that he and Irby-Melgoza had done methamphetamine and that methamphetamine was found in Irby-Melgoza's toxicology results. Jackson had denied using drugs around the time of the murder to Dr. Lott and on the stand at trial.

¶71. The jury was instructed that Jackson's voluntary intoxication was not a defense to first-degree murder and did not negate Jackson's deliberate design to murder Irby-Melgoza. *See Jackson v. State*, 815 So. 2d 1196, 1202 (¶16) (Miss. 2002) ("[V]oluntary intoxication is not a defense to murder."). Because the jury was properly instructed that voluntary intoxication is not a defense to murder, they were in their right to reject Jackson's claims that

27

he was not under the influence of drugs at the time of the murder. It is fully within the jury's province to resolve any factual disputes in conflicting evidence. *Langston v. State*, 791 So. 2d 273, 280 (¶14) (Miss. Ct. App. 2001).

¶72. Thus, the jury's decision to reject Jackson's claims that he was not voluntarily intoxicated and find that he murdered Irby-Melgoza with deliberate design is not against the weight of the evidence. Upholding the jury's verdict would not sanction an unconscionable injustice.

### B.     Burglary Conviction

¶73. Jackson claims his burglary conviction was against the overwhelming weight of the evidence because the State failed to prove he had the "requisite intent to steal for burglary." To convict Jackson of the burglary of Chewalla Primitive Baptist Church, the State had to prove "breaking and entering [of] a church . . . with intent to commit some crime therein." Miss. Code Ann. § 97-17-33(2) (Rev. 2020). Jackson argues that his only intent was to seek refuge and water, "not to 'steal or carry away goods.'"

¶74. The defendant's "[f]elonious intent is an issue of fact which falls within the exclusive province of the jury." *Jackson v. State*, 90 So. 3d 597, 604 (¶27) (Miss. 2012). That "[i]ntent may be proved by circumstantial evidence." *Id.* The intent "is usually shown by acts and declarations of the defendant coupled with facts and circumstances surrounding him at the time." *Johnson v. State*, 94 So. 3d 316, 321 (¶11) (Miss. Ct. App. 2011).

¶75. There was sufficient evidence of Jackson's felonious intent from which the jury could

reasonably infer his intent to commit a crime inside the Chewalla Primitive Baptist Church. Jackson admitted to law enforcement that he broke into the church for refuge and water and, while therein, stole a Bible "because he wanted to do some reading." Jackson testified at trial that he broke into the church and took the Bible because he felt like he "had to protect the word of God, to protect the family Bible."

¶76. The jury heard and weighed any conflicts in this testimony before arriving at their guilty verdict. Based on Jackson's act of taking the Bible from the church, a rational jury could find beyond a reasonable doubt that he had the requisite felonious intent to commit the crime of stealing the Bible from the church. This finding was within "the exclusive province of the jury." *Jackson*, 90 So. 3d at 604 (¶27). Thus, the jury's decision to reject Jackson's claims that he did not have the requisite intent for burglary is not against the weight of the evidence. Upholding the jury's verdict would not render an unconscionable injustice.

## V. Supplemental Pro Se Brief Claims

¶77. Jackson filed a supplemental pro se brief with a proposed brief attached and a motion to amend his supplemental brief, and this Court accepted the proposed brief and amendment to it as filed. However, we do not address these contentions because the supplemental briefing fails to comply with Mississippi Rule of Appellate Procedure 28(a)-(b) and is procedurally barred for failing to cite to relevant authority, make meaningful arguments supported by relevant authority, or cite the record. M.R.A.P. 28(a)(7).

## CONCLUSION

¶78. For the reasons above, we find that none of the issues Jackson presents demonstrates reversible error. Accordingly, we affirm Jackson's convictions and sentences.

¶79. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**